**COMPUTER STATISTICS, INC.**

v.

**Harry E. BLAIR, Jr., James O. Davis and William H. Bloch.**

No. 73–H–1727.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 31, 1976.

**1342**

Stephen D. Susman, Sidney L. Ravkind, Mandell & Wright, Houston, Tex., for plaintiff.

Richard A. Hall, Branscomb, Gary, Thomasson & Hall, Corpus Christi, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGLETON, District Judge.

### Introduction

On December 20, 1973, plaintiff Computer Statistics, Inc. (hereinafter referred to as "CSI") filed this antitrust action against Harry E. Blair, Jr. (hereinafter referred to as "Blair"), James O. Davis (hereinafter referred to as "Davis"), and William Bloch (hereinafter referred to as "Bloch") alleging that said defendants violated Section 2(c) of the Robinson-Patman Act [1] by engaging in commercial bribery of officers, employees, and agents of companies with whom Blair and Davis had engaged in data processing equipment transactions. Defendants have denied that they have engaged in commercial bribery, or that Section 2(c) prohibits the same. Defendants have also alleged that: (a) CSI's claims are barred by the four-year statute of limitations; (b) CSI's claims are barred by the doctrine of "tainted shares"; (c) CSI lacks standing because, unlike its former wholly-owned subsidiary Computer Properties, Inc. (hereinafter referred to as "CPI"), it was not engaged in buying, selling, or leasing data processing equipment; and (d) any damages suffered by CSI were not suffered "by reason of" defendants' antitrust violations.

On April 19, 1976, trial commenced before the court without a jury and continued for four weeks. Due to the factual complexity of the plaintiff's case, this court has referred to the various transactions complained of by the number assigned to them on plaintiff's exhibits 870 through 872, included herein as Appendix "A." Those exhibits set out the eighteen (18) transactions made the basis of this action. For the reasons hereinafter stated, at the close of plaintiff's evidence the court granted defendants'[2] motion for judgment as to all transactions listed on Plaintiff's Exhibit No. 870, transactions numbered 15, 16, and 17 on Plaintiff's Exhibit No. 871, and transaction numbered 25 on Plaintiff's Exhibit No. 872. As to transactions numbered 20, 22, 27, 23, and 26 on Plaintiff's Exhibit No. 871 and transactions numbered 18, 19, and 21 on Plaintiff's Exhibit No. 872, the court found at the close of plaintiff's case that a

---

1. Section 2(c) provides:

 [That] it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

2. Defendant Bloch was dismissed from the lawsuit without prejudice shortly after the trial commenced.

prima facie case had been established and defendants should present evidence on such transactions. However, at the close of all the evidence, plaintiff elected to take a non-suit with regard to transactions numbered 22 and 27 on Plaintiff's Exhibit No. 871.

At the conclusion of all the evidence, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

Plaintiff CSI, formerly known as Statistical Service Corporation (SSC), has been engaged in the service bureau business (performing data processing services for others on data processing machines owned or leased by it) in Houston, Texas, and Shreveport, Louisiana, since prior to 1963.

At all times relevant hereto, CSI purchased and leased from others and sold and leased to others IBM unit record equipment (which should be distinguished from computers), both in connection with its own service as an independent means of generating revenue—a natural extension of its service bureau business. The names in which such transactions were conducted varied. At times it leased and sold unit record equipment to its service bureau customers; at times it leased and sold such equipment to others. At times it purchased, leased, and sold unit record equipment through its wholly-owned subsidiary CPI (formerly known as "Statistical Properties Corporation"); at times it did so in its own name. Any distinctions between CSI and CPI are not of such a nature as to affect the outcome of this action. For all relevant purposes and at all times relevant hereto, Computer Properties, Inc., was the same entity as its parent corporation, Computer Statistics, Inc.

From 1964 through August, 1967, defendants Blair and Davis were, respectively, Chairman of the Board and President of CSI. Each owned from twenty percent (20%) to approximately twenty-five percent (25%) of the outstanding stock of CSI, were individually the largest stockholders, and together could and did control CSI's business direction and activities. On August 24, 1967, each sold his stock in CSI to Arnold and Audrey Malkan, but not until September 29, 1967, were new directors elected. When Blair and Davis each sold his shares, all parties to the agreement contemplated that SSC would offer additional shares to the public; this offering was promptly undertaken, and it was completed and sold out on March 20, 1968. Community Life Insurance Company, the Malkans' predecessor in interest, then owned approximately forty-four percent (44%) of CSI's outstanding shares (including additional shares purchased from a number of shareholders other than Blair and Davis).

Furthermore, it is clear that at all relevant times, CSI was either in or prepared to be in the business of leasing, dealing in, or brokering unit record equipment. The principal evidence to the contrary was the testimony of defendant Davis, CSI's President from April, 1963, until about September 29, 1967, whose actions and those of Clifford Johnson, a Vice President of CSI, in traveling around the country on behalf of CSI in search of opportunities to buy, lease, and sell unit record equipment belie their testimony.

While CSI on occasions purchased computers and leased them to others, CSI was not in the business of leasing or dealing in computers. Nevertheless, in late 1967 and early 1968, CSI was interested in finding attractive computer leasing or dealing opportunities, was prepared to grasp and capitalize on such opportunities, and, in fact, through CPI, purchased two UNIVAC computers for lease to others. CSI's interest in computers at that time is further evidenced by statements in its prospectus at the time it went public on March 20, 1968, and by the activities of its operating vice presidents, Clifford Johnson and Morris Lewis. Its ability to participate in such opportunities is evidenced by the facts that the computers which it did buy for lease to others were one hundred percent financed and that it raised gross funds of $700,000 in its public offering.

At various times since 1964, Blair and Davis, individually and jointly, bought and sold or leased computers and computer com-

ponents and peripherals. While payments were made by them to officers and employees of companies from whom they bought or to whom they sold and/or leased computers, in all instances save one, such payments were not a cause of competitive injury to CSI since CSI was not generally engaged in the business of leasing or dealing in computers. CSI's contention that it should have been in that business is an issue in a state court suit involving the doctrine of misappropriation of corporate opportunity. The one instance where such a payment was a material cause of competitive injury to CSI is discussed *infra* as transaction numbered 27 on Plaintiff's Exhibit No. 871.

*Transaction No. 20, Plaintiff's Exhibit No. 871.* In early 1966, Blair purchased twenty-nine unit record machines (fourteen 026 key punches and fifteen 056 verifiers) from American National Life Insurance Company (hereinafter referred to as "ANICO") for $25,000. Thomas J. Eaves (hereinafter referred to as "Eaves"), a vice president of ANICO, represented ANICO in the transaction. Blair and Davis resold these machines with very little effort and in a very short time for $44,600, twenty-eight machines to EDP Leasing Corporation and one to an accounting firm in Galveston. The net profit of $19,600 was split between Eaves and Davis pursuant to an oral agreement. A trustee account managed by defendant Bloch was used to receive and disburse payments. Blair, Davis, and Eaves concealed the payment of $9,200 to Eaves from the Board of CSI, from ANICO, and from CSI until 1971, when Davis disclosed the payment to Eaves in a deposition taken in a related proceeding in the state court of Harris County (hereinafter referred to as "Harris County lawsuit").

Both Blair and Davis participated in making the arrangement with Eaves and both benefited from the transaction (Davis by receipt of $10,400 and Blair by having interest-free use of the Bloch trustee account funds for over a year). A principal purpose of the payment of $9,200 to Eaves was to influence ANICO's decision to sell the machines for $25,000 to Blair and Davis, and

Eaves performed no services whatsoever in connection therewith. Furthermore, this court cannot ignore the efforts of Blair, Davis, and Eaves to make it appear to ANICO that Davis, who has had no prior dealings with ANICO on his own account, was not involved in the transaction.

*Transaction No. 21, Plaintiff's Exhibit No. 872.* In early 1967, Blair and Davis purchased two 557 collators from ANICO, which ANICO had been leasing from IBM, and immediately resold them for a net profit of $4,224 of which they paid $2,000 to Eaves and split the balance of $2,224. The payment of $2,000 to Eaves was a commercial bribe intended to influence ANICO's decision as to whom to sell and for what price and for which Eaves performed no services. This payment did not become known to CSI until Davis's deposition was taken in 1971 in the Harris County lawsuit.

*Transaction No. 23, Plaintiff's Exhibit No. 871.* In 1968, Eaves asked Blair to find some unit record equipment to lease to Trans World Life Insurance Company (hereinafter referred to as "TWL"), a subsidiary of ANICO. Blair arranged to purchase some of the equipment and then turned the deal over to Davis who, with Eaves' help, leased the equipment to TWL. Jerome Gleekel (hereinafter referred to as "Gleekel"), a vice president of TWL, negotiated the lease for it. Shortly thereafter, Davis sent Eaves a "gift" of $1,000. After adding several machines to the lease in January, 1969, Davis later that year, with the assistance of Eaves, sold TWL the leased unit record equipment for $31,000, realizing a net profit on the lease and connected sale of $28,092.69. Of this amount, Davis paid Gleekel $5,000 in cash. This payment was not disclosed to CSI until 1973, in Davis's deposition in litigation pending in state court in Tarrant County (hereinafter referred to as "Tarrant County lawsuit").

Blair, as well as Davis, benefited from this transaction; and Blair, more than Davis, was responsible for the corruption of Eaves. Between 1964 and 1973, Blair "loaned" Eaves at least $70,000. These so-

called loans, allegedly made in consideration of friendship, had no maturity date, bore no interest, and were not secured by promissory notes or otherwise. The "loans" were never repaid, and Blair had undertaken no efforts to collect them. These "loans" were never disclosed to Eaves' superiors at ANICO, and when they were discovered, Eaves was asked to resign and ANICO ceased doing business with Blair. These "loans" by Blair and the "gift" by Davis to Eaves were intended to influence Eaves' recommendations to ANICO and TWL. There was no indication that Eaves performed any services therefor. Furthermore, as with each payment made to an employee of ANICO, ANICO had no knowledge that any of its personnel were accepting such payments.

The payments by Blair and Davis to Eaves and Gleekel, as described above (transactions numbered 20 and 23 on Plaintiff's Exhibit No. 871 and transaction numbered 21 on Plaintiff's Exhibit No. 872) were a material cause of CSI's failure to consummate the transactions in question since CSI had recurrent business contacts with Eaves and ANICO during all times relevant hereto.

*Transactions Nos. 18 and 19, Plaintiff's Exhibit No. 872.* At various times from October, 1967, through February, 1968, Davis and Blair purchased certain unit record equipment (key punches and verifiers) from American General Life Insurance Company (hereinafter referred to as "American General") which were resold for a net profit of $10,553, of which amount they had agreed to pay and did pay $1,075 to Charles Hebble (hereinafter referred to as "Hebble"), an employee of American General. The existence and nature of payments did not become known to CSI until document production in the Harris County lawsuit in 1972 and a subsequent deposition in 1973 in the Tarrant County lawsuit.

Furthermore, this payment was concealed by Hebble from his employer. A representative of American General, Mr. Robert H. Ellis, testified that their policy was to keep all unit record equipment up to standards and to make all necessary repairs. There-fore, whatever services Hebble may have performed in connection with these sales were those which he normally would have performed for his employer.

The payments to Hebble were commercial bribes, designed to influence to whom and at which price the unit record equipment was sold by American General and when discovered, were regarded as improper by Hebble's superior at American General. These payments were a material cause of CSI's failure to earn a net profit of $10,553, since CSI had prior business contact with American General and Hebble regarding unit record equipment.

*Transaction No. 27, Plaintiff's Exhibit No. 871.* During 1967, Texas Eastern Transmission Corporation (hereinafter referred to as "Texas Eastern") was leasing two UNIVAC 1005 computers from UNIVAC. Both Davis, while president of CSI, and Morris Lewis, a vice president in charge of the Shreveport service bureau, learned that Texas Eastern would be returning the computers to UNIVAC when they went off lease in 1968. UNIVAC had another customer, Mississippi Chemical, which was seeking to acquire two 1005s, and the UNIVAC salesman for that account, Bill Parker (hereinafter referred to as "Parker"), so notified his branch manager, Hugh Coats (hereinafter referred to as "Coats"). Any direct sale by UNIVAC to Mississippi Chemical would have had to be made at list prices which the latter was unwilling to pay. To accommodate their customer, Mississippi Chemical, and to assure a profit to themselves (obviously in lieu of the commission they would have received from their employer UNIVAC on a direct sale), Coats and Parker arranged to have Davis purchase the 1005s on lease to Texas Eastern from UNIVAC through Texas Eastern at substantially discounted prices to which Texas Eastern, as a UNIVAC lessee exercising a purchase option, was entitled. Davis purchased one 1005 on January 29, 1968, and retained an option to purchase the second. At the same time that Davis, with the assistance of Coats and Parker, was arranging the purchase and option, Morris

Lewis (hereinafter referred to as "Lewis"), representing CSI, approached both Texas Eastern and UNIVAC, both of which had done considerable business with CSI in the past, in an effort to acquire one or both computers. Lewis was told that Davis had an option to purchase both and that Lewis would have to deal with Davis. After Lewis found another 1005 in Oklahoma, Davis agreed to allow CSI to buy one of the 1005s leased to Texas Eastern. Davis subsequently found a second 1005 elsewhere and sold two 1005s to Mississippi Chemical in June, 1968, at a net profit of $30,702.83, which he split three ways with Coats and Parker. The payments by Davis of $10,234.38 each to Coats and Parker were commercial bribes intended to influence to whom and at which price UNIVAC was willing to sell computers. Davis offered no other explanation for these payments which Coats (Parker's superior) concealed from UNIVAC.

In view of the fact that UNIVAC had continuously dealt with CSI and not Davis since 1964 and in view of CSI's interest and ability to deal in computers during the first part of 1968 (manifested in part in its efforts to purchase one or both of the 1005s in question and its actual purchase and lease of two new UNIVAC computers), the inference is inescapable that the payments by Davis to Coats and to Parker were a material cause of CSI's failing to receive from UNIVAC an opportunity to participate as the middleman in the UNIVAC-Texas Eastern-Mississippi Chemical deal and CSI's consequent loss of a profit of $30,702.83.

All of the payments described above were not disclosed by Blair and Davis to the purchaser of their stock in August, 1967. In fact such payments were fraudulently concealed from the plaintiff throughout the negotiations leading up to the sale of the stock. Subsequent to their purchase of CSI and prior to the institution of this action, the current owners of CSI brought suit in state district court of Harris County claiming that Blair and Davis had diverted corporate opportunities to their personal gain. In that suit, discovery was severely limited by the presiding judge. As a result, through the tedious and time-consuming discovery processes in that case, plaintiff CSI had no opportunity to discover any facts relating to their federal cause of action and had no reason to suspect the existence of such facts. Not until discovery in the Tarrant County action and a subsequent broadening of the discovery in the Harris County action did CSI learn of the facts which gave rise to a federal antitrust action. Throughout the extended negotiations and litigation between these two parties, CSI has at all times clearly exercised due diligence in attempting to discover the ways in which defendants' conduct has injured it.

The court's findings as to the reasons for the payments described above are based in part, as to defendant Blair, on what the court perceives to be a modus operandi of paying certain persons for favors and, as to Davis, on the admitted illegality of his payment to Gleekel. The defendants have not refuted the persuasive evidence of blatant commercial bribery.

The court's conclusions with regard to unit record equipment is reinforced by the fact that key punch equipment was in short supply in 1965 and 1966. Davis' testimony to the contrary is contradicted by the documentary evidence. The availability of each such machine or group of machines for purchase and resale must be regarded as a unique business opportunity. Moreover, CSI and/or CPI during 1966 was purchasing 024 key punch machines, which were less modern, less desirable machines than 026s, while at the same time CSI was leasing 026 machines from ANICO and EDP Leasing Corporation, the very companies from which Blair and Davis had bought and to which they had sold such machines.

It is obvious that Davis, Blair, and their silent partner Eaves, simply capitalized on unique business opportunities that developed during those years. The payments and so-called loans to Eaves and Hebble made certain that ANICO and American General dealt with Blair and Davis on these opportunities rather than with CSI. There

is no indication that the amount of profit in these transactions was due particularly to Blair's and/or Davis's "fiscal, managerial, and business skill," as asserted in defendants' brief.

In considering the liability of each defendant, this court finds that defendant Blair was intimately and completely involved in each of the above-described transactions.

While plaintiff's computation of the net profits realized by the defendants on the various transactions is in some respects unavoidably arbitrary, it is far superior to the computations urged on the court by defendants' accountant. CSI has computed net profits in the manner in which they were computed by defendants in accounting for net profits to each other and to Eaves, Coats, and Parker as partners. Furthermore, the defendants presented no expert testimony as to the actual values of equipment, as to the improbability of CSI realizing the same net profit on each transaction as was realized by defendants, or as to CSI's ability to mitigate damages by acquiring similar equipment from companies whose employees were not bribed by defendants. Accordingly, the court finds the plaintiff's computations to be most accurate. Therefore, the court finds that the net profits realized by Blair and Davis, including any bribes paid by them, on the transactions numbered 20 and 23 on Plaintiff's Exhibit No. 871 and transactions numbered 18, 19, and 21 on Plaintiff's Exhibit No. 872 total $62,469.69, and that CSI has been damaged in such amount; and that the net profit realized by Davis in transaction numbered 27 on Plaintiff's Exhibit No. 871 totals $30,702.83, and that CSI has been damaged by that amount.

### Conclusions of Law

■ This court has jurisdiction of the subject matter of this suit and over the parties hereto.

■ The defendants have violated the literal language of Section 2(c) of the Robinson-Patman Act by making payments to employees of companies from whom they were buying and to whom they were selling unit record equipment (and in the case of Davis's payments to Coats and Parker, computers). While this is not a case involving price discrimination, every court to consider the matter has held that Section 2(c) gives rise to a cause of action for commercial bribery regardless of whether direct or indirect price discrimination is involved. *See, e. g., Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674 (9th Cir. 1976); *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851 (9th Cir. 1965). The defendants have clearly engaged in commercial bribery since a principal purpose of their payments to Eaves, Hebble, Coats, Parker, and Gleekel, was to induce them to influence their employers to do business with defendants and at prices acceptable to defendants.

■ While a number of cases contain language to the effect that an adverse impact on competition is not a *sine qua non* of liability under Section 2(c), the court believes that some anticompetitive effect is necessary and that a plaintiff who cannot show competitive injury lacks standing to complain about payments although they literally fit within the language of the statute. *Compare Calnetics, supra,* with *Rangen, supra.* Because the court has found that CSI was not generally in the business of leasing or dealing in computers, it follows that CSI is not entitled to recover for any damage it might conceivably have sustained by virtue of payments made by Blair and Davis in connection with computer transactions other than the UNIVAC transaction described above. Therefore, the court granted defendants' motion for judgment at the close of plaintiff's case as to all the transactions listed on Plaintiff's Exhibit No. 870, as to transactions numbered 15, 16, and 17 on Plaintiff's Exhibit No. 871, and as to transaction numbered 25 on Plaintiff's Exhibit No. 872.

As to the UNIVAC computer transaction, CSI was in fact competing head-on with Davis during a brief period of time in early 1968 when it was interested in finding and

was prepared to take advantage of attractive computer opportunities.

■ Therefore, CSI clearly has standing to complain of unlawful bribes paid by Blair and Davis in connection with the unit record transactions described above since at the times of these transactions CSI was at least as actively engaged in the business of buying, purchasing, and leasing unit record equipment as were Blair and Davis. Furthermore, where a company such as CSI is frustrated in its opportunities to engage in a natural expansion of its existing business, the normal requirements of standing are relaxed. *Heatransfer Corp. v. Volkswagenwerk A.G.,* 1975–1 Trade Cases ¶ 60,309 (S.D.Tex.1975). Insofar as the unit record transactions and the UNIVAC computer transaction are concerned, CSI was clearly within that area of the economy in which a breakdown of competitive conditions was directly caused by defendants' commercial bribery.

While defendants raise some question as to whether the "except for services rendered" clause of Section 2(c) is applicable to cases of commercial bribery as distinguished from cases involving illicit brokerage, the court need not resolve that issue in the case at bar since Eaves, Hebble, Coats, Parker, and Gleekel either rendered no services to the defendants or only rendered such services as would have normally been rendered by their employers in connection with the transactions at issue.

■ The four-year statute of limitations imposed by 15 U.S.C. § 15b was tolled by the fraudulent concealment of defendants—at the time the illicit payments were made, and at the time the defendants sold their stock in CSI. There is no doubt that the doctrine of "fraudulent concealment" applies to antitrust actions. *Atlantic City Electric Co. v. General Electric Co.,* 312 F.2d 236 (2d Cir. 1962), *cert. denied,* 373 U.S. 909, 83 S.Ct. 1298, 10 L.Ed. 411 (1963). Furthermore, the above-described restrictions placed on discovery in the Harris County action prevented CSI from discovering any facts to support this claim and thus also tolled the limitation period. The plaintiff has demonstrated by a preponderance of the evidence that it exercised due diligence in attempting to discover any manner in which it might have been injured by defendants' conduct. *See Westinghouse Electric Corp. v. Pacific Gas & Electric Co.,* 326 F.2d 575 (9th Cir. 1964) and *Laundry Equipment Sales Corp. v. Borg-Warner Corp.,* 334 F.2d 788 (7th Cir. 1964).

■ The plaintiff argues that the doctrine of "tainted shares," as explicated in *Bangor Punta Operations v. Bangor & A. R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), is applicable to the case at bar. For two reasons the court finds the doctrine inapplicable: first, both Blair and Davis fraudulently concealed their wrongdoing from the purchasers of their shares in CSI; and, secondly, Blair and Davis have, subsequent to the sale of their shares in August, 1967, engaged in continuing wrongs against CSI in the form of commercial bribery. *Bangor Punta* expressly excludes both such circumstances from its holding. 417 U.S. at 711, 94 S.Ct. 2578.

■ CSI has been injured by reason of defendants' payments in connection with the transactions described above since in each case the payments were a material cause of CSI's failure to consummate the precise transactions consummated by defendants. In an antitrust case, once the fact of the injury has been demonstrated by a preponderance of the evidence, the plaintiff is entitled to utilize any just and reasonable method short of speculation to calculate the amount of its damages based on relevant data. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

In this case, CSI does not seek to recover for any generalized loss of future or past profits. Therefore, it is immaterial whether CSI would or would not have realized an overall net profit in its operations had it added the profits realized on the particular transactions in question to its earnings. Here, CSI is complaining of particular and specific transactions which it contends it was deprived of making by virtue of defendants' commercial bribery. Because of

the uniqueness of each transaction and because the defendants have failed to demonstrate any equally reasonable method of calculating damage, the court concludes that the amount of CSI's damage should be measured by the amount of net profit in fact realized by defendants in the complained of transactions. The court has found that the total net profits realized by Blair and Davis in the transactions in which they were jointly involved, as calculated by the defendants themselves prior to the anticipation of litigation, were $62,469.69 and that the net profit realized by Davis in the remaining transaction (the one involving UNIVAC) was $30,702.83. In calculating such net profits, the court has refused to allow the defendants to deduct as a legitimate and necessary business expense the very payments which the court has found to violate Section 2(c) of the Robinson-Patman Act.

■ Accordingly, plaintiff CSI is entitled to recover from Blair and Davis, jointly and severally, the sum of $279,517.56, which represents its actual damages trebled in the IBM unit record transactions and the UNIVAC transaction. CSI is also entitled to recover its costs of suit and a reasonable attorney's fee as set forth hereinafter.

In the event that any of the foregoing Findings of Fact also constitute Conclusions of Law, they are also adopted as Conclusions of Law. In the event that any of the foregoing Conclusions of Law also constitute Findings of Fact, they are also adopted as Findings of Fact.

### Attorney's Fee

■ Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that a successful plaintiff in an antitrust action may recover "a reasonable attorney's fee." The assessment of a reasonable fee is in the sound discretion of the court after a consideration of the unique circumstances of each case. To assist in such an evaluation, this court has carefully considered the following factors:

(1) time and labor spent;

(2) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the government;

(3) customary fee in the community for similar work;

(4) novelty and difficulty of the questions presented;

(5) standing of counsel at the bar—both counsel receiving the award and opposing counsel;

(6) quality of the attorney's work;

(7) contingent nature of success;

(8) preclusion of other employment during the pendency of the litigation;

(9) amount involved and results obtained; and

(10) importance of the legal principle established.

*See, e. g., Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir. 1969), *aff'g* 287 F.Supp. 143 (D.Md. 1968); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 245 F.Supp. 258, 302 (M.D. Penn.1965), *vacated on other grounds,* 377 F.2d 776 (3d Cir. 1967), *aff'd in part on other grounds, rev'd on other grounds,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Osborn v. Sinclair Refining Co.,* 207 F.Supp. 856 (D.Md.1962), *rev'd on other grounds,* 324 F.2d 566 (4th Cir. 1963); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974); *City of Detroit v. Grinnell,* 495 F.2d 448 (2d Cir. 1974).

With regard to certain of these criteria, there is, of course, no doubt about the high standing of both plaintiff's and defendants' counsel, as well as their diligence and effectiveness. This was a highly complex and important antitrust action in which all counsel labored many hours over the legal concepts involved. The novelty of these concepts required careful legal analysis. A cause of action for commercial bribery under Section 2(c) of the Robinson-Patman Act has rarely been tested or used.

In addition, at least two unusual circumstances exist in this case deserving careful consideration in the fee application. First, this action is but one aspect of the litigious relationship between the parties. It becomes necessary, therefore, to identify and

excise the legal services rendered to plaintiff for related state court litigation. Secondly, the plaintiff chose twice during the pendency of this action to change counsel. Of course, any additional attorney's fee paid by plaintiff because of these changes should not be assessed against the defendants.

To assist this court in considering the award of attorneys' fees, a hearing was held on July 27, 1976. Each of the attorneys-in-charge from the three law firms involved in this litigation testified in detail from supporting documents as to the nature of the services performed as well as the time spent thereon. Except for an additional small contingency clause in the contract of the initial law firm, all counsel were paid on an hourly basis. The hourly rates charged range from $30 to $60 per hour for an associate's time to $60 to $75 per hour for a partner's time, as reflected on Exhibit "A" to plaintiff's fee application, included herein as Appendix B. Considering each of the necessary factors, these amounts are certainly well within the bounds of reasonableness and the usual and customary charges for such services in this community.

In order to compensate for any duplication of efforts required by the change of counsel, plaintiff's application contains a downward adjustment of $4,068.75. In addition, this court is compelled to make two other adjustments in order to eliminate duplicative efforts. First, the attorney-in-charge of this action at Bracewell & Patterson, Mr. Kenneth R. Wynne, testified that of the amounts reflected on Exhibit "A" under his firm's name, approximately $1500 of it represented a charge for the time spent familiarizing subsequent counsel. Secondly, the amounts charged by Bracewell & Patterson for "preparation for trial," totaling $10,881.25, should not be assessed against the defendants. Such preparation was conducted extensively by each firm. Accordingly, the duplication required by changes in counsel necessitates, in addition to the $4,068.75 already deducted, a further adjustment of $12,381.25.

Moreover, this court will not assess against defendants any amount CSI is required to pay its attorneys for the preparation of the fee application and accompanying memoranda. Such services were not rendered in connection with the recovery of any damages and should be deducted. *Locklin v. Day-Glo Color Corp.,* 378 F.Supp. 423 (N.D.Ill.1974); *Union Leader Corp. v. Newspapers of New England, Inc.,* 218 F.Supp. 490 (D.Mass.1963), *vacated on other grounds,* 333 F.2d 798 (1st Cir. 1964), *cert. denied,* 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964). The only case cited by plaintiffs, *Perkins v. Standard Oil Co.,* 474 F.2d 549 (9th Cir. 1973), *cert. denied,* 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 (1973), presents an entirely different set of circumstances. After prefacing its remarks with the emphasis that such matters are within the discretion of the judge, the *Perkins* court found no abuse of discretion in awarding an amount for the preparation of a fee application where such services involved considerable time such as taking depositions and the like. No such onerous task existed for CSI's attorneys. Therefore, the $1995 appearing on Exhibit "A" as "preparation of fee application" should also be deducted.

As a result of the foregoing adjustments to Exhibit "A" of plaintiff's fee application, the amount of attorneys' fees before the plaintiff would have this court use a "multiplier" of 1.25, should be $146,092.50. Since each of the attorneys representing CSI maintained careful records, that amount reflects only the legal services provided to CSI in this action and excludes all work done in any related litigation.

Any further adjustments urged by defendants are without merit. It has been argued that the plaintiff should not recover attorneys' fees for those transactions on which the court found no liability. Defendants correctly note that such an adjustment was allowed in *Vandervelde v. Put and Call Brokers and Dealers Assn.,* 344 F.Supp. 157 (S.D.N.Y.1972). However, the rejected grounds of recovery in that case were so unsupportable that they "hindered develop-

ment of those facts which were actually significant." 344 F.Supp. at 160. More appropriate to this case, the District Court in *Vandervelde* commented:

> Plaintiffs are, of course, not to be faulted in retrospect for selecting a theory which was ultimately rejected by the Court, nor for selection of a particular trial strategy. 344 F.Supp. at 161.

None of the claims asserted by plaintiffs were frivolous. Thus, to deduct any amount from the fee award would be "unfair and contrary to the spirit of the statute." *Farmington Dowel Products Co. v. Forster Mfg. Co.,* 421 F.2d 61 (1st Cir.1970).

■ Similarly, defendants' allegation that plaintiff should not recover fees for two "lead counsel" must be rejected. This court will not interfere with the decision by plaintiff's counsel to divide the burdens of a complex trial between them. Both of these experienced attorneys were at all times earning their fee. Furthermore, the decision of the plaintiff's attorneys not to charge a higher hourly rate for trial time should not concern defendants. The hourly rate charged is reasonable for whatever the specific nature of the services rendered in this trial.

The final question facing this court in awarding attorneys' fees is whether to adopt plaintiff's use of a "multiplier." After adjustments were made on Exhibit "A" to the Fee Application, CSI used a multiplier of 1.25 in order to arrive at the requested fee of $200,585.93.

■ Increasing the fee award beyond an hourly rate is designed to consider subjective criteria such as the nature of the legal issues and the effectiveness of counsel. However, the basic question is still one of reasonableness. Unlike many antitrust actions, plaintiff's attorneys here had a fixed fee arrangement with CSI. While consideration of the subjective criteria is essential to a determination of the reasonableness of the fee award, it is clear that "[i]n no event . . . should the litigant be awarded a fee greater than he is contractually bound to pay." *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714,

718 (5th Cir.1974). Consequently, when presented with the type of fee arrangement here, there is an upper limit to an award of attorneys' fees—an upper limit to what would be reasonable. The policy behind such a limit is equally lucid: the award of attorneys' fees is compensatory and it would be per se unreasonable to have the client receive in attorneys' fees more than he has paid.

The authorities cited by plaintiff in support of the use of a multiplier are not inconsistent with this court's approach. In *Wynn Oil Co. v. Purolator Chemical Corp.,* 391 F.Supp. 522 (M.D.Fla.1974), for example, as with most such cases, there was no fixed amount the plaintiff was bound to pay. Instead "by agreement with their client plaintiff's attorneys [were] entitled to a reasonable fee."

■ In the case now before the court, the fee CSI is contractually bound to pay was computed on an hourly basis and, with the above-described, necessary adjustments, amounts to $146,092.50. In light of *Johnson, supra,* any amount in excess of this would not be reasonable within the meaning of 15 U.S.C. § 15.

Accordingly, plaintiff Computer Statistics, Inc., is entitled to recover $146,092.50 from defendants Blair and Davis, jointly and severally.

### Costs

■ With regard to the taxable costs plaintiff is entitled to recover from the defendants, testimony at the hearing on July 27, 1976, revealed that Exhibit "B" to plaintiff's Application for Fees and Costs (included herein as Appendix C) was inaccurate in that the costs from Bracewell & Patterson were attributable not only to this action but also to related state litigation. Consequently, a revised statement of costs in the form of an affidavit was filed on August 20, 1976. The affidavit of Kenneth R. Wynne, attorney-in-charge from Bracewell & Patterson reflects a total cost for copying expenses, deposition expense, and filing fees of $8,871.55. This amount does not include any costs of the related litiga-

tion and carefully excludes any costs incurred by reason of plaintiff's changes in counsel. In addition, a total of 640 hours of paralegal services were performed through the firm of Bracewell & Patterson which were directly related to this federal cause of action. Such services being performed at the rate of $20 per hour, plaintiff is entitled to recover $12,800 for paralegal services.

 Defendants' contention that paralegal fees may not be recovered as a cost is without merit. Generally, there is a split in authority as to whether the fees paid a paralegal are recoverable as part of attorneys fees or as part of costs. *Compare Pacific Coast Agricultural Export Assn. v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir.1975) *with Michelman v. Clark-Schwebel Fiber Glass Corp.,* 1975 Trade Cases ¶ 60,551 (S.D.N.Y.1975). It is clear, however, that paralegals perform valuable legal services previously performed by young attorneys. Their use has reduced the cost of legal services and should be encouraged. Moreover, the fees paid paralegals are not overhead costs such as would be included in a determination of whether an attorney's hourly rate is reasonable. On the contrary, paralegals command an hourly rate billed to the client. Therefore, if the compensatory policy behind the award of attorneys fees and costs is to be continued, this court should not eliminate from recoverable costs the amount attributable to paralegal fees.

Accordingly, plaintiff Computer Statistics, Inc., is entitled to recover costs in the amount of $28,250.99 from defendants Blair and Davis, jointly and severally.

Plaintiff is hereby directed to submit a Final Judgment consistent with these Findings of Fact and Conclusions of Law within fifteen (15) days of the entry hereof.

Appendix A to follow.

## APPENDIX A

DAMAGES

BLAIR

| # | | Year | Sales Price | Direct Cost of Sale | Gross Profit | Rental/ Commission Income | Depreciation/ Direct Costs | Indirect Costs | Net Income |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Permian (Allen) | 1965 | $ 267,500.00 | $208,251.31 | $ 59,248.69 | | | $ 37,924.12 | $ 21,324.57 |
| 2 | Permian 360-30 | 1969 | 140,000.00 | 2,530.61 | 137,469.39 | | | 18,759.25 | 118,710.14 |
| 3 | Woolworth | 1965 | 191,000.00 | 118,063.00 | 72,937.00 | | | 26,984.47 | 45,952.53 |
| 5 | DK & K-Woolworth | 1968 | 105,000.00 | 73,228.94 | 31,771.06 | | | 18,664.20 | 13,106.86 |
| 30 | Lockheed-Anico | 1969 | 526,000.00 | 325,079.33 | 200,920.67 | $136,200.00 | | 18,759.25 75,037.00 | 243,324.42 |
| 31 | Bresenhaun | 1971-1974 | | | | 219,456.00 | $ 80,078.04 | 41,696.64 | 97,681.32 |
| | | | $1,229,500.00 | $727,153.19 | $502,346.81 | $355,656.00 | $ 80,078.04 | $237,824.93 | $540,099.84 |

PLAINTIFF'S EXHIBIT 870

## APPENDIX A—Continued

DAMAGES

DAVIS

| # | | Year | Sales Price | Direct Cost of Sale | Gross Profit | Rental/ Commission Income | Depreciation/ Direct Costs | Indirect Costs | Net Income |
|---|---|---|---|---|---|---|---|---|---|
| 15 | EBS-NCS | 1969 | | | | $ 46,500.00 | $ 10,000.00 | $ 3,785.40 | $ 32,714.60 |
| 16 | EBS-I & I | 1969 | $ 61,795.75 | $ 53,415.73 | $ 8,380.02 | | | 5,161.91 | 3,218.11 |
| 17 | EBS-I & I | 1970 | 64,000.00 | 50,000.00 | 14,000.00 | | | 6,110.94 | 7,889.06 |
| 20 | Anico - EDP | | 44,600.00 | 25,000.00 * | | | | | 19,600.00 ** |
| 22 | Anico | 1971 | 24,000.00 | 18,000.00 | 6,000.00 | | | 5,852.80 | 147.20 |
| | | 1972 | 2,400.00 | 1,280.00 | 1,120.00 | | | 1,096.14 | 23.86 |
| | | 1973 | 15,000.00 | 13,525.00 | 1,475.00 | | | 5,498.89 | (4,023.89) |
| 27 | Univac | | 100,428.11 | 69,725.28 * | | | | | 30,702.83 ** |
| 23 | THL | 1969 | 31,000.00 | 3,300.00<br>2,750.00<br>1,215.00<br>432.45<br>1,800.00<br>6,000.00 | 15,502.55 | 16,490.25 | | 2,523.60<br>1,376.51 | 28,052.69 |
| 26 | LWC Data | 1966 | | | | 5,000.00 | | 39.00 | 4,961.00 |
| | | | $343,223.86 | $246,443.46 | $ 46,477.57 | $ 67,990.25 | $ 10,000.00 | $ 31,445.19 | $123,335.46 |

* Includes all costs of transaction
** Net income from partnership

PLAINTIFF'S EXHIBIT 871

## APPENDIX A—Continued

DAMAGES

BLAIR & DAVIS

| # | Year | Sales Price | Direct Cost of Sale | Gross Profit | Rental/ Commission Income | Depreciation/ Direct Costs | Indirect Costs | Net Income |
|---|---|---|---|---|---|---|---|---|
| 18 | American General | | | | | | | $ 2,100.00 ** |
| 19 | American General | $ 13,750.00 | $ 5,250.00 | $ 8,500.00 | | $47.00 | | 8,453.00 |
| 21 | Anico | | | | | | | 4,224.00 ** |
| 25 | CNA-ABC | | | | | | | |
| | Davis | 60,000.00 | 44,282.83 | 15,717.17 | | | | 15,717.17 |
| | Blair | 120,000.00 | 104,110.34 | 15,889.66 | | | | 15,889.66 |
| | | $193,750.00 | $153,643.17 | $ 40,106.83 | | $47.00 | | $ 46,383.83 |

** Net income from partnership

APPENDIX B to follow

PLAINTIFF'S EXHIBIT 872

## APPENDIX B

Attachment to Plaintiff's Application
for Attorneys' Fees and Costs

EXHIBIT "A"

| ATTORNEY'S NAME AND STATUS | HOURLY RATE | TYPE WORK | HOURS | FEE |
|---|---|---|---|---|
| **Fulbright & Jaworski** | | | | |
| David J. Beck (P*/65) | $75.00 | D * | 55.25 | $ 4,413.75 |
| | | P&M | 4.00 | 300.00 |
| | | PTC | 1.25 | 93.75 |
| | | PFT | 16.00 | 1,200.00 |
| Sim Lake (A/69) | $50.00 | LR | 7.00 | 350.00 |
| | | PTC | .25 | 12.50 |
| | | P&M | 5.00 | 250.00 |
| Robert Walls (A/71) | $50.00 | D | 42.75 | 2,137.50 |
| | | LR | 15.50 | 775.00 |
| | | P&M | 5.50 | 275.00 |
| | | T | 2.25 | 112.50 |
| Wm. Pakalka (A/72) | $50.00 | LR | 21.50 | 1,075.00 |
| | | D | 2.50 | 125.00 |
| **Mandell & Wright** | | | | |
| Stephen D. Susman (P/65) | $75.00 | LR | 12.75 | 956.25 |
| | | P&M | 96.25 | 7,218.75 |
| | | D | 108.25 | 8,118.75 |
| | | PFT | 233.00 | 17,475.00 |
| | | T | 261.00 | 19,575.00 |
| | | FA | 17.00 | 1,275.00 |
| Sidney Ravkind (P/60) | $75.00 | D | 31.00 | 2,325.00 |
| | | PFT | 54.00 | 4,050.00 |
| | | T | 236.00 | 17,700.00 |
| Steve Bavousett (A/75) | $45.00 | D | 16.00 | 720.00 |
| | | LR | 8.00 | 360.00 |
| Gary McGowan (A/73) | $60.00 | FA | 12.00 | 720.00 |

\* Abbreviations:

P Partner
A Associate
D Discovery
P&M Pleadings and Motions
PTC Pretrial Conferences and preparation therefor
T Trial and preparation during trial
LR Legal research
FA Preparation of fee application
PFT Preparation for trial

APPENDIX B—Continued

EXHIBIT "A"—Continued

| ATTORNEY'S NAME AND STATUS | HOURLY RATE | TYPE WORK | HOURS | FEE |
|---|---|---|---|---|
| Bracewell & Patterson | | | | |
| Kenneth R. Wynne (P/67) | $60.00 | D | 70.25 | 4,215.00 |
| | | P&M | 49.25 | 2,955.00 |
| | | LR | 42.00 | 2,520.00 |
| | | PFT | 110.75 | 6,645.00 |
| | $65.00 | D | 241.50 | 15,697.50 |
| | | P&M | 9.25 | 601.25 |
| | | PTC | 4.50 | 292.50 |
| | | LR | 7.75 | 503.75 |
| | | PFT | 119.75 | 7,783.75 |
| Michael B. Lee (A/72) | $30.00 | D | 3.75 | 112.50 |
| | | P&M | 55.25 | 1,657.50 |
| | | LR | 165.50 | 4,965.00 |
| B. Thomas Cook (A/74) | $30.00 | D | 279.00 | 8,370.00 |
| | | P&M | 88.75 | 2,662.50 |
| | | PTC | 6.00 | 180.00 |
| | | LR | 122.00 | 3,660.00 |
| | | PFT | 43.25 | 1,297.50 |
| H. Bruce Golden (A/74) | $30.00 | D | 135.50 | 4,065.00 |
| | | P&M | 59.75 | 1,792.50 |
| | | PTC | 5.75 | 172.50 |
| | | PFT | 60.00 | 1,800.00 |
| Joe Roady | | | | 975.00 |

Total.....................$164,537.50

Adjustments:

Fulbright & Jaworski:
 Duplication—20 hours @ $75.00 per hour)............$1,500.00

Mandell & Wright:
 Duplication—34.25 hours @ $75.00 per hour)........$2,568.75

Total adjustment.........$ 4,068.75

$160,468.75

Multiplier 1.25 x $160,468.75

Total fee applied for: $200,585.93

APPENDIX C to follow

1358

▆▆▆▆▆▆▆▆▆▆

## APPENDIX C

### EXHIBIT "B"

### COSTS

Fulbright & Jaworski:

 Copying expenses....................................$ 117.67
 Paralegal (33.50 hours @ $15.00 per hour)........$ 502.50

Mandell & Wright:

 Witness subpoena fees............................$ 205.20
 Copying expenses.................................$ 1,728.57
 Deposition expenses..............................$ 3,265.50
 Paralegal........................................$ 630.00
 Law clerk (20 hours @ $6.50 per hour)............$ 130.00

Bracewell & Patterson:

 Copying expenses.................................$ 4,096.10
 Filing fees......................................$ 1,060.49
 Deposition expenses..............................$14,436.48
 Paralegal (200 hours @ $10.00 per hour)..........$ 2,000.00
 (1944.50 hours @ $18.00 per hour)......$35,001.00

 Total...............$63,173.51

NOTE: The figures above from Bracewell & Patterson
 were subsequently revised by an affidavit
 submitted on August 20, 1976.