**GREGORIS MOTORS, Plaintiff,**

**v.**

**NISSAN MOTOR CORPORATION IN USA, et al., Defendants.**

No. CV 84–1282.

United States District Court, E.D. New York.

March 13, 1986.

---

Field, Lomenzo & Turret, P.C., New York City, for plaintiff.

Owen & Fennell, New York City, for defendants Nissan Motor Corp. in USA and Individual Defendants.

Schwartz, Klink & Schreiber, New York City, for defendants Five Town Pontiac-Datsun Inc., Amityville Datsun, Ltd. and Bayview Datsun.

Latham & Watkins, Chicago, Ill., for defendant Nissan Motor Corp. in USA and Individual defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Gregoris Motors, Inc. (Gregoris) brings this suit against Nissan Motor Corporation in U.S.A. (Nissan), the four named Datsun dealerships (Dealerships), and the five named individual defendants (Individual Defendants), who are present or former employees of Nissan at the company's offices in Piscataway, New Jersey. Plaintiff alleges that all the defendants have violat-

ed §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the Robinson-Patman Act, 15 U.S.C. § 13(c); and the Racketeering Influenced And Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962, 1964(c). In addition, plaintiff alleges that defendant Nissan has violated the Dealers Day in Court Act, 15 U.S.C. §§ 1221 to 1225.

Gregoris is a Datsun dealership owned by Gerard DeGregoris. Nissan is the American branch of the Japanese manufacturer of Datsun vehicles. The gravamen of the Gregoris complaint is that Nissan together with the four Dealerships and the Individual Defendants have acted to reduce plaintiff's allocation of Datsun vehicles with the aim of harming his business, monopolizing the Datsun market in the area, and punishing plaintiff for filing this and an earlier lawsuit. Among other things, plaintiff alleges that the Dealerships have submitted false sales documents to increase their allotment of new cars, that they have bribed the five Individual Defendants in order to receive larger allotments, and that Nissan either acquiesced in or abetted these activities. In addition, plaintiff alleges that Nissan treated Gregoris disparately and with disfavor by lowering its allocations and assigning it the least desirable vehicles.

At the outset, plaintiff sought a preliminary injunction, which this Court denied. Now Nissan, three of the Dealership defendants and the five Individual Defendants move to dismiss the Complaint for failure to state claims on which relief can be granted, and for failure to allege fraud with particularity in the RICO claim (Count 5), Rule 9(b), Fed.R.Civ.P. Defendants also request an award of costs and reasonable attorney's fees under Rule 11, Fed.R. Civ.P., and 28 U.S.C. § 1927. Alternatively, the five Individual Defendants move for dismissal of the action as to them for lack of personal jurisdiction. Rule 12(b)(2), Fed. R.Civ.P. As the parties have submitted and the Court considers material outside of the pleadings, the Court now converts the motion to dismiss to one for summary judgment where appropriate. Rules 12(b)(6), 56(b), Fed.R.Civ.P.

## I.

The alleged anti-trust and other violations began during the period of voluntary import quotas by the Japanese car manufacturers. The quota agreement was reached in 1981 and extended in 1984. The year 1985 saw an easing of the quotas. During the voluntary restrictions, getting the new Japanese automobile of one's choice was not always easy. A purchaser did not order a vehicle, but rather reserved the next available model with the desired options. As a result, consumers did a great deal of shopping for the dealer who could most quickly provide the chosen automobile, and dealers were able to exact substantial mark-ups on the most popular car models.

Defendant Richard S. Hungerford, Nissan's Regional Sales Manager, by affidavit outlines the distribution system for new Datsun vehicles. First, the number of new Datsuns to be shipped to the United States for sale is determined for a ninety-day period. These are then divided among the dealership regions according to each region's share of national sales for the previous ninety-day period. Each regional sales office then allocates vehicles to dealerships within the region based on each dealer's share of the previous ninety-day sales, its inventory, and "orders in port" (Hungerford Affidavit ¶ 6). This is called the Equitable Distribution System (EDS). The allocation calculation is done by computer. Of pivotal importance in the EDS is the submission of Retail Delivery Reports (RDR cards), which document the retail sales, or travel rate, that are the basis for the allocation of new cars (Hungerford Aff. ¶ 7).

A dealer does not have to purchase his full allotment and a dealer can purchase new cars from sources other than defendant Nissan U.S.A. For example, dealers buy and sell vehicles to each other (Affidavit of Gerard DeGregoris ¶ 3), and buy vehicles from sources in Puerto Rico, which was not subject to the voluntary import

restrictions. Sales of these cars that have not been received through the EDS are not included in the dealer's travel rate. In other words, the fewer EDS cars a dealer sells, the lower his share for the next allocation period.

Gregoris alleges, among other things, that defendant Dealerships have submitted false RDR cards, either by forging cards for fictitious purchasers or entering a trade to a dealer as a retail sale and submitting a RDR card. Mr. DeGregoris asserts that the resulting double sales documentation must make it obvious to Nissan that dealers are manipulating travel rates and Nissan's failure to act is an acquiescence in fraud (DeGregoris Aff. ¶ 3). Plaintiff also alleges that Nissan has quietly abandoned the EDS and now bases its allocations solely on the travel rates (Complaint ¶ 17). Moreover, plaintiff alleges Nissan has knowingly allowed some dealers to obtain vehicles beyond their EDS allocation by accepting false "fleet orders" (Complaint ¶ 19). Finally, Gregoris alleges that Nissan delays shipments to plaintiff so the vehicles cannot be sold in time to be included in the travel rate (Complaint ¶ 20), and allots undesirable models to plaintiff (Complaint ¶ 21). Gregoris claims it receives disfavored treatment because it does not give bribes and tries to stop the false RDR cards and fleet orders (Complaint ¶ 24).

## II.

In Counts 1 and 2 of the Complaint Gregoris claims that its allocations of new cars from Nissan was substantially reduced in the first quarter of 1984, as compared to the same quarter of 1983, to the point of threatening to destroy the business. Gregoris further alleges that from March 1981 to March 1984 the four Dealerships submitted false orders and sales reports and bribed the Individual Defendants in order to secure their cooperation and increase their allocations, and such increased allocations were at the expense of plaintiff's allotments or otherwise gave the other dealers a market advantage to plaintiff's detriment.

The Court must first examine the anti-trust claims to determine whether the rule of *per se* liability or rule of reason applies. The rule of *per se* liability applies when the agreement or practice at issue appears on its face to be one that would almost always act to restrict competition within a market. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Generally, the *per se* rule is applied only to practices with which the courts have had considerable experience. *Id.* at 8, 99 S.Ct. at 1556. Here, plaintiff is not complaining of the EDS, but of means used to avoid or alter its effect. The conduct outlined in the Complaint lacks the purposefulness and coherency to approach a recognized category of *per se* restraint. Moreover, plaintiff appears to be alleging the sort of vertical, non-price fixing restraint that the United States Supreme Court held should be scrutinized under the rule of reason standard. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Accordingly, the defendant's alleged violations of the Sherman Act must be examined under the rule of reason.

Under the rule of reason, plaintiff must demonstrate a precise harm caused by the defendants' activities. That harm must be a restraint on competition, not merely damage to a competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Damage to a competitor can lessen competition within a market. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Nevertheless, injury to a competitor alone is not enough to invoke the anti-trust laws. Rather, it must be demonstrated that the injury to the competitor causes a lessening of competition in the market as a whole. *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.1978), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 538 (1979).

By and large, summary judgment is not a favored means of disposing of anti-trust claims. Where, however, allegations of the complaint fail to establish requisite elements of an anti-trust claim, summary judgment is appropriate. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir.1980). Plaintiff here alleges that by the actions of the defendants, Gregoris was allocated fewer Nissan cars of less desirable types in 1984 than in the same period in 1983. Plaintiff makes the conclusory claim that as a result its business has been injured, its continued existence is threatened, and competition is reduced (Complaint ¶ 28). Assuming for the purposes of defendants' motions that plaintiff received fewer cars from Nissan solely as a result of defendants' actions, Gregoris fails to establish the requisite element of anti-competitive impact. In fact, plaintiff has failed to establish monetary injury to itself.

At this point the Court takes notice of material submitted in opposition to the motion for a preliminary injunction. For April 1983, Gregoris Motors showed a net profit of $21,030.00 and paid owner Gerard De-Gregoris a salary of $15,625.00 (Gregoris Motors Financial Statement for April 1983, Exhibit C of the June 14, 1984 Reply Affidavit of Richard S. Hungerford). For April 1984, Gregoris Motors had a net profit of $22,606.00 and paid Mr. DeGregoris $14,000.00 in salary (Gregoris Motors Financial Statement for April 1984, Exhibit D of June 14, 1984 Hungerford Reply Aff.). Mr. Hungerford's summary comparison of the first quarters of 1983 and 1984 from Gregoris Motors' monthly financial status is as follows:

|  | Number of New Vehicles Sold | | Net Profit | | Owners' Salary | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 1983 | 1984 | 1983 | 1984 | 1983 | 1984 |
| January | 65 | 59 | $15,449 | $29,996 | $12,500 | $14,000 |
| February | 51 | 51 | 4,407 | 6,813 | 12,500 | 14,000 |
| March | 65 | 55 | 33,993 | 19,189 | 12,500 | 17,500 |
| April | 64 | 49 | 21,030 | 22,606 | 15,625 | 14,000 |
| TOTAL | 245 | 214 | $74,879 | $78,604 | $53,125 | $59,500 |

(Corrected Affidavit of Richard Hungerford in Opposition to the Motion for Preliminary Injunction at 10).

The Financial Statements for July and August 1984 show a net *loss* for July of $13,368.00 and a net profit for August of $44,678.00. While the Gregoris dealership is not always profitable, it does not approach insolvency.

In addition, it appears that there was a thirty percent decrease in the availability of Nissan cars in the New York region in the first quarter of 1984 as compared to the first quarter of 1983. This is evidenced not only by the affidavits of the owners of defendants Five Town Pontiac-Datsun, Amity Datsun, and Bayview Datsun, but by the comparison chart of 1983 and 1984 first quarter sales for thirty-five regional dealerships (June 14, 1984 Hungerford Reply Aff. Exhibit B). That comparison chart shows only two regional dealerships with increased sales and the remaining thirty-three with widely varying drops in sales, averaging about twenty-five percent.

In October 1984 the Court concluded that the data showed that Gregoris was not suffering the irreparable harm, that is, threatened extinction, necessary to support a grant of preliminary injunctive relief. That same data shows a lack of anti-competitive impact. There is no data that shows Gregoris' existence is imperiled. In fact, the data shows plaintiff may have been more profitable in 1984 than in 1983. Moreover, while there may have been few-

er cars available to plaintiff in the first quarter of 1984 as compared to the same period in 1983, plaintiff has put forth nothing that would support a conclusion that this was the result of anything but general lower availability and plaintiff's lower travel rate. In sum, plaintiff individually has not suffered an anti-competitive impact that the anti-trust laws are designed to redress, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), nor has plaintiff demonstrated anti-competitive effect on any market as a whole, *see Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The allegations of anti-competitive effect as to plaintiff individually and to any market as a whole are no more than conclusory. As "the absence of a sufficient allegation of anticompetitive effects is fatal to the existence of the cause of action," *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir.1980), the first cause of action for violation of § 1 of the Sherman Act must be dismissed.

### III.

Count 2 of the Complaint alleges violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Again, it alleges in a conclusory manner damages to Gregoris, reduction of competition, increased consumer prices, and a monopoly by defendants "Curwood and/or Five Town in the area serviced by Curwood and/or Five Town and plaintiff;" (Complaint ¶ 30). The Court first notes that this second count facially alleges claims against all the defendants. Yet the only defendants alleged to obtain the monopoly are Curwood and Five Town. Nissan is alleged to aid purposely in creation of the two defendants' monopoly, presumedly out of pure animus for plaintiff (Complaint ¶ 30). The particular defendants liable to plaintiff under Count 2 are not specified (Complaint ¶¶ 31, 44B).

While the anti-trust claims need not be pleaded with more than usual particularity, the allegations of Count 2 fall short of the basic notice pleading requirements of Rule 8(a), Fed.R.Civ.P. The count is clear enough in claiming that Nissan, Curwood, and Five Town agreed to conduct that would diminish plaintiff's share of new cars and put it out of business, giving Curwood and Five Town a monopoly. However, even with the rote incorporation of the preceeding paragraphs 1 to 25, it fails to allege adequately an agreement and conduct entered into by the other defendants with specific intent to attempt to give Curwood and Five Town a monopoly. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980). Were this the only defect in Count 2, the proper course would be for the Court to allow plaintiff to cure the defect by amendment.

A claim under § 2 of the Sherman Act must identify a relevant market. While plaintiff has not so identified it, as automobiles are interchangeable commodities, *e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), the product market in this case is not merely Datsuns but Datsuns and all comparable cars. In actions under § 2 of the Sherman Act, separate identification of a relevant geographic market is not necessary. *Compare* § 7 of the Clayton Act, 15 U.S.C. § 18. Rather, to the extent the concept is germane, it is subsumed in identification of the relevant market. The allegation is of monopolization of the "area serviced" by plaintiff and two named defendants. Correctly, the relevant market here is local and not national, although the activity involves interstate commerce. *See Lorain Journal Co. v. United States*, 342 U.S. 143, 147–50, 72 S.Ct. 181, 183–85, 96 L.Ed. 162 (1951).

Again, the Sherman Act protects competition, not competitors. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 (2d Cir.1979). Even if the Court accepts that the relevant market targeted for monopolization is the area serviced by plaintiff and the two defendants, under § 2 that market encompasses Datsuns and all other

**909**

comparable new cars. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 392–93, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). In order to make out even an attempted monopolization of the relevant market, there must be a basis for claiming a domination of the local new car market by defendants Five Town and Curwood, not merely their dominant position with respect to Datsuns or plaintiff's lesser share of the market. *Levitch v. Columbia Broadcasting Systems, Inc.,* 495 F.Supp. 649, 663 (S.D.N.Y.1980), *aff'd,* 697 F.2d 495 (2d Cir.1983). Moreover, monopoly power under § 2 is the power to control prices or unreasonably restrict competition within the relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. at 389, 76 S.Ct. at 1004; *Hayden Publishing v. Cox Broadcasting Corp.,* 730 F.2d 64, 68 (2d Cir.1984). A manufacturer's natural monopoly power over his own product is not by itself a violative of § 2 of the Sherman Act. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. at 393, 76 S.Ct. at 1006; *Speed Auto Sales, Inc. v. American Motors Corp.,* 477 F.Supp. 1193, 1197 (E.D.N.Y.1979). If Nissan chooses to deal with one dealership at the exclusion of another, it is not necessarily an unlawful exercise of monopoly power. *Orek Corp. v. Whirlpool Corp.,* 579 F.2d 126, 133 (2d Cir.1978) *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979); *Speed Auto Sales, Inc. v. American Motor Corp.,* 477 F.Supp. at 1197. To have a monopoly power that is violative of § 2, Nissan or the two dealerships must have the power to control or restrict competition in the sales of all new cars in this area, not only new Nissan cars.

There is not the barest allegation of this sort of monopoly power, nor the slightest factual argument that any monopolistic impact has been achieved. *Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. at 668–69. Furthermore, insofar as the Complaint alleges an attempt or conspiracy to monopolize, it lacks any support for a claim of (1) a dangerous probability of success in monopolizing the relevant product market and (2) a specific intent to

destroy competition or control prices within the relevant market. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d at 841. In fact, it would be ridiculous to contend that Nissan with its limited supplies as a result of import quotas could supply enough cars within a large enough geographical region to gain a market share that would give it monopoly power over new car sales in the region.

■ Accordingly, the Court concludes that the claim under § 2 of the Sherman Act is inadequate on its face. Nor can the Court discern any factual basis for a claim that Nissan, Five Town, and Curwood came near a dangerous probability of succeeding in monopolizing the new car market in plaintiff's service area, or had any specific intent to destroy competition within the relevant market. Thus, amendment would be futile. Failure to allege essential elements of a § 2 claim requires dismissal. *Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. at 669. Count 2 of the Complaint therefore is dismissed.

### IV.

The third count of the Complaint alleges violation of § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), as against all the defendants. Specifically, plaintiff alleges acceptance of bribes, kickbacks, or other value by the Individual Defendants from dealers seeking to gain acceptance of false RDR cards and fleet orders and obtain early shipment of cars and desirable models (Complaint ¶ 33).

■ The law on the interpretation and application of § 2(c) of the Robinson-Patman Act is sparse and not particularly settled. Briefly, § 2(c), 15 U.S.C. § 13(c), forbids commercial bribery in connection with the sale or purchase of goods or services. *E.g., Grace v. E.J. Kozin Co.,* 538 F.2d 170 (7th Cir.1976). The Robinson-Patman Act is generally considered part of the body of anti-trust law. The purpose of the Act is to prohibit the granting of demands for unfair preferences in the sale of goods and services. *F.T.C. v. Henry Broch & Co.,*

363 U.S. 166, 174, 80 S.Ct. 1158, 1163, 4 L.Ed.2d 1124 (1960). The courts have since faced the question of whether anti-competitive injury is a required element of a claim for violation of § 2(c) of the Act. While several courts have required anti-competitive injury for a § 2(c) claim; *e.g., Larry R. George Sales Co. v. Cool Attic Corporation,* 587 F.2d 266 (5th Cir.1979); *Computer Statistics, Inc. v. Blair,* 418 F.Supp. 1339, 1347 (S.D.Tex.1976); this Court is persuaded that anti-competitive injury is not necessary for maintaining a claim under § 2(c); *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367 (3d Cir.1985); *Metrix Warehouse Inc. v. Daimler-Benz Aktiengesell-Schaft,* 716 F.2d 245 (4th Cir. 1983); *Municipality of Anchorage v. Hitachi Cable, Ltd.,* 547 F.Supp. 633 (D.Alaska 1982). Such a requirement is unduly restrictive and is not part of the plain language of the statute.

■ Defendants here contend that in addition to anti-competitive injury, plaintiff must have suffered the injury of price discrimination as a result of bribery. The Court is persuaded otherwise. Although the Robinson-Patman Act is directed mainly at price discrimination, § 2(c) does not specifically mention price discrimination as the forbidden goal of the bribery. Increasingly, the case law supports the conclusion that a violation of § 2(c) can be based on indirect price discrimination. In fact, business practices other than price discrimination can give rise to a § 2(c) action. *Municipality of Anchorage v. Hitachi Cable Ltd.,* 547 F.Supp. at 639; *Computer Statistics, Inc. v. Blair,* 418 F.Supp. at 1347.

While *Computer Statistics, Inc. v. Blair,* 418 F.Supp. 1339, is generally cited as the authority for application of § 2(c) to practices other than price discrimination, this interpretation was endorsed many years earlier. In *F.T.C. v. Simplicity Pattern Co.,* the United States Supreme Court declared, "Subsections (c), (d), and (e) [of § 2 of the Robinson-Patman Act], on the other hand, unqualifiedly make unlawful certain business practices other than price discriminations." 360 U.S. 55, 65, 79 S.Ct.

1005, 1011 (1959); *accord F.T.C. v. Henry Broch & Co.,* 363 U.S. at 176, 80 S.Ct. at 1164. In particular, "indirect price discrimination," whereby the bribes or kickbacks can be calculated as a cost to a company is recognized as an injury giving rise to a § 2(c) violation. *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d at 371–73 (and cases discussed therein); *Grace v. E.J. Kozin Co.,* 538 F.2d at 174–75. Finally, non-price injuries, including harm to a fiduciary relationship and preferential treatment, are recognized bases for a § 2(c) cause of action. *Anchorage v. Hitachi,* 547 F.Supp. at 637–41; *Computer Statistics, Inc. v. Blair,* 418 F.Supp. at 1347–49.

In this case, plaintiff alleges that other dealerships bribed the Individual Defendants to receive early delivery and sought-after models. While the Court entertains doubts as to actual injury suffered by the alleged discriminatory business practices, the Court cannot say as a matter of law that there is no possible injury. Anti-competitive effect is not necessary. It may be that plaintiff can prove that it was injured because of the extra efforts required to obtain desirable vehicles from sources other than Nissan U.S.A.

■ Nevertheless, plaintiff's § 2(c) claim is not without defect. Bribery under § 2(c) cannot be alleged in a vague or conclusory manner. Only paragraph 23 of the Complaint states with any specificity the nature of the bribes, the recipients, and the beneficiaries of the preferential treatment. Mr. Hungerford and Mr. Murphy allegedly received money and use of real property in exchange for accepting false RDR cards, false fleet orders, and tampering with allocations of desirable cars for the benefit of defendants Five Town, Amityville, and Bayview. This barely fulfills the notice pleading requirements of Rule 8(a), Fed.R. Civ.P., as to these five defendants. But in spite of the denials of the defendants, the allegations suffice to state claims requiring trial. The Complaint otherwise fails to state a § 2(c) claim against any of the other defendants. Accordingly, Count 3 of the Complaint is dismissed as to defendants

Nissan, Curwood, Matsun, La Reau and Tully.

Finally, plaintiff now argues that Count 3 states a cause of action under § 2(e) of the Act, 15 U.S.C. § 13(e). A violation of § 2(e) is not pleaded in Count 3 and the Court will not add it as part of this decision. In any event, plaintiff's argument is of dubious merit. *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819, 848 (M.D.Tenn.1974).

## V.

Gregoris alleges for Count 4 of the Complaint that defendant Nissan has failed to perform and comply with the provisions of the dealership contract in violation of the Dealers Day in Court Act, 15 U.S.C. §§ 1221 to 1225. The gravamen of Count 4 is an allocation complaint. The Dealers Day in Court Act gives rise to an action when an automobile manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise...." 15 U.S.C. § 1222.

■ Good faith as it is used in the statute does not have the liberal interpretation given to the term elsewhere. *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978). Rather, good faith is strictly construed to mean "freedom from coercion, intimidation, or threats of coercion or intimidation...." 15 U.S.C. § 1221(e). Actual coercion or intimidation, or threats, are essential to the necessary allegation of lack of good faith. *E.g., Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1038 (5th Cir.1981); *McGeorge v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 55–56 (4th Cir.1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608, 610 (7th Cir.), *cert. denied*, 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972); *McDaniel v. General Motors Corp.*, 480 F.Supp. 666, 676 (E.D.N.Y.1979), *aff'd mem.*, 628 F.2d 1345 (2d Cir. 1980).

The Complaint alleges coercion and intimidation by Nissan in the improper allotment of vehicles to plaintiff, by late shipments, and acceptance of false fleet orders and RDR cards. Generally, late deliveries and misallocation alone do not constitute lack of good faith. *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 445 (9th Cir.1979); *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 845 (M.D.Tenn.1974). Lack of good faith, however, must be judged in the context of all the facts and circumstances. *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d at 445; *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d at 911. Misallocation and late delivery in a context of practice and purpose to achieve acquiescence to an illegal demand can constitute pressure of a threatening or coercive nature. *E.g., McGeorge v. Leyland Motor Sales, Inc.*, 504 F.2d at 55; *American Motor Sales Corp. v. Semke*, 384 F.2d 192 (10th Cir. 1967). The mere acceptance of false RDR cards and fleet orders lacks, however, the direct pressure and intimidation necessary under the Act. Not every possible detriment is a threat or intimidation. Rather, the conduct must be uniquely and specifically coercive to an intended victim. *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 685 (6th Cir.1976).

■ The issue, then, becomes what result did defendant allegedly seek to achieve through misallocation and late delivery? The Act contemplates intimidation as a means to fix prices, force a dealer to accept vehicles it does not want, or accept termination. *E.g., Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 516 (10th Cir.1976); *McGeorge v. Leyland Motor Sales*, 504 F.2d at 54; *Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110, 125 (E.D.N.Y.1976). Neither the Act nor the case law addresses the issue of extortion. It is extortion, that is, pressuring Gregoris to pay bribes or an illegal premium to get the desirable vehicles allotted to it, that the Complaint al-

leges (¶ 36). There is an illogic in this. If desirable models are those with certain equipment, Nissan can set a higher price on that equipment and ship only cars with that equipment to this country, thereby getting a higher price without all this alleged domestic plotting and planning. Likewise, Nissan can ship only the most popular colors and raise its price, it need not engage in coercion. Be that as it may, what is necessary is an illegal demand backed by coercive sanctions. *Fray Chevrolet Sales v. General Motors Corp.*, 536 F.2d at 685. Holding back desired models to force a dealership to take unpopular models, *American Motors Sales Corp. v. Semke,* 384 F.2d at 196–97, or another line of vehicles, *McGeorge v. Leyland Motor Sales,* 504 F.2d at 54, have both been recognized as coercive conduct. The allegations of misallocation and late delivery paired with a demand of extra illegal consideration for popular vehicles is facially sufficient for a claim under the Act. Proof at trial, however, will likely require a strong showing of an "either or proposition," not mere contextual inferences or a sense of being threatened. *Sherman v. British Leyland Motors*, 601 F.2d at 445; *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d at 685; *McDaniel v. General Motors Corp.*, 480 F.Supp. at 677.

Accordingly, Nissan's motion to dismiss Count 4 is denied.

## VI.

As a final count of the Complaint, Gregoris alleges violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) by all the defendants. 18 U.S.C. §§ 1962, 1964(c). Count 5 perfunctorily realleges paragraphs 1 to 25 of the Complaint and then recites more or less statutory language to state a violation of RICO. Defendants move to dismiss this count for failure to plead with required particularity, Rule 9(b), Fed.R.Civ.P., and for failure to state allegations that make out a claim under the RICO statute.

Subsection 1964(c) creates a civil cause of action when "any person is injured in his business or property by reason of a violation of section 1962 of this chapter," and provides for recovery of treble damages. Subsection 1962(c) makes it unlawful for a person employed by an enterprise engaged in interstate commerce to participate "in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt." Subsections 1962(a) and (b) make it unlawful for a person to acquire or maintain an interest in an enterprise with income derived from racketeering activity. Subsection 1962(d) makes it unlawful for a person to conspire to do the acts forbidden in subsections (a), (b), and (c).

In order to maintain a private RICO action, as a § 1964(c) claim is referred to, the plaintiff must allege a pattern of racketeering activity. A racketeering activity is defined as an act or threat "chargeable" under certain state criminal laws, including extortion and bribery, or "indictable" under federal law, including statutes forbidding bribery, mail fraud, wire fraud, and extortion. 18 U.S.C. § 1961(1)(A), (B). A "pattern" of racketeering activity requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5). The United States Supreme Court recently held that a private RICO action requires neither a "racketeering injury" to plaintiff, nor criminal conviction for racketeering activities. *Sedima, S.P.R.I. v. Imrex Co., Inc.*, —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In particular, the Court held that the predicate acts need not be established beyond a reasonable doubt in a private RICO action. *Id.*, 105 S.Ct. at 3282–83.

Nevertheless, it is settled that the pleading of predicate acts for a RICO claim must meet the particularity requirements of Rule 9(b), Fed.R.Civ.P., where the acts are based in fraud. *E.g., Rich-Taubman Associates v. Stamford Restaurant*, 587 F.Supp. 875, 878–79 (S.D.N.Y.1984). It would appear from the Complaint that Gregoris is alleging acts of mail and wire fraud in the submission and acceptance of false RDR cards and fleet orders, and brib-

ery and extortion in connection with the acceptance and filing of false orders.

Specifically, Gregoris alleges as predicate acts (1) an April 1983 false fleet order placed and received by All Brands Datsun (Complaint ¶ 19(a)), (2) a July 1983 false fleet order placed and received by Curwood (¶ 19(c)), (3) false military and fleet orders placed by Nemet Motors between 1980 and 1983 (¶ 19(b)), (4) unspecified dealers within the region who placed false orders between 1980 and 1983 (¶ 19(d)), (5) bribery of Messrs. Hungerford and Murphy (¶ 23), and (6) extortion of plaintiff.

None of these allegations meets the particularization requirements of Rule 9(b). All Brands and Nemet Motors are not defendants here. Allegations of unnamed dealers committing acts somewhere between 1980 and 1983 does not meet even the notice pleading requirements of Rule 8(a), Fed.R.Civ.P. In no case are the particular means of the presumed mail or wire fraud stated. There are no specifics as to times or people or documents involved in the false orders. Nor is there any indication of even the vaguest sort as to when the alleged bribes or extortion demands occurred and who made them to whom. At best one can infer that Nissan was the recipient of the false orders and bribes and that unspecified dealers bribed defendants Hungerford and Murphy (Complaint ¶ 23) at unspecified times. These allegations are plainly insufficient as predicate acts to support a RICO claim. *See, Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Rich-Taubman Associates v. Stamford Restaurant*, 587 F.Supp. at 879. Moreover, by including Nissan as a defendant and failing to allege particular employees of Nissan as the persons committing predicate acts in Count 5, plaintiff leaves the "person" and "enterprise" undifferentiated, thereby failing to allege the RICO claim correctly and adequately. *Bennett v. Berg*, 685 F.2d at 1061–62.

The Court could continue narrating instances of lack of required particularization and failure to allege factual elements necessary for the RICO claim. It would serve little purpose. While the Court is not so unrealistic as to expect particularization of the predicate acts at a level to support a criminal complaint, the absence of persons, dates, and mediums in the attempted allegations of fraud, bribery, and extortion is fatal in a civil RICO action. Moreover, the conclusory nature of the allegations of Count 5, parroting as they do statutory language without necessary facts, make them plainly inadequate. In particular, general re-allegation of twenty-five earlier paragraphs, which are intended to make out anti-trust and Dealer's Day in Court violations in addition to a RICO claim, is not sufficient or proper. RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint.

Defendants' motion to dismiss Count 5 of the Complaint is granted. Plaintiff has ninety days in which to amend Count 5 to conform to the requirements of Rule 9(b), Fed.R.Civ.P., and state a claim under 18 U.S.C. §§ 1962, 1964(c).

## VII.

Finally, the individual defendants, Messrs. Hungerford, Murphy, Matsun, La Reau, and Tully ask that the action be dismissed as to them for lack of personal jurisdiction. Rule 12(b)(2), Fed.R.Civ.P. The motion is moot as to Messrs. Matsun, La Reau, and Tully. Counts 1, 2, and 5 are dismissed as to all defendants. Count 3 is dismissed as to Messrs. Matsun, La Reau, and Tully. Count 4 is alleged against Nissan only.

The Court concludes that it has personal jurisdiction over Messrs. Hungerford and Murphy. Although by affidavit they state they have not committed any of the acts alleged, and reside and carry on all activities wholly outside of New York, they are alleged to have committed what amount to tortious acts without New York causing injury within the state. N.Y.

**914**

CPLR § 302(a)(3). Generally, non-domiciliary corporate officers are not personally liable or individually subject to long-arm jurisdiction for their acts done as corporate employees. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902 (2d Cir.1981); *Sheldon v. Kimberly-Clark Corp.*, 105 A.D.2d 273, 482 N.Y.S.2d 867, 869 (2d Dep't 1984). Nevertheless, where the corporate employee acts in his personal interest, not wholly within his legitimate corporate duties, or in clear violation of a statute or duty of care, the employee is individually liable and subject to *in personam* jurisdiction. *Marine Midland Bank v. Miller*, 664 F.2d at 903; *Sheldon v. Kimberly-Clark*, 105 A.D.2d 273, 482 N.Y.S.2d at 869; *Bailey v. Baker's Air Force Gas Corp.*, 50 A.D.2d 129, 376 N.Y.S.2d 212 (3d Dep't 1975); *LaLumia v. Schwartz*, 23 A.D.2d 668, 257 N.Y.S.2d 348 (2d Dep't 1965). The alleged taking and demanding of bribes and concomitant fraud are such tortious wrongs performed for personal benefit and violative of statutory prohibitions, both state and federal. Accordingly, if the acts are proven, Messrs. Hungerford and Murphy are personally liable and not protected from personal jurisdiction by the fiduciary shield. Finally, should plaintiff adequately re-allege the RICO claim against Messrs. Tully, Matsun, and La Reau, in view of the foregoing discussion, the Court would have personal jurisdiction over them.

## VIII.

Plaintiff's anti-trust claims under the Sherman Act, 15 U.S.C. §§ 1, 2, are not based on any anti-competitive injury. Therefore, no anti-trust claim is stated. In fact, the existence of any injury to the Gregoris dealership is dubious. Accordingly, Counts 1 and 2 of the Complaint are dismissed as to all defendants. Rule 56(b), Fed.R.Civ.P.

The motion to dismiss Count 3 of the Complaint alleging violation of the Robinson-Patman Act, 15 U.S.C. § 13(c), is denied as to defendants Hungerford and Murphy, and granted as to all the other defendants as it fails to state a claim as to them. Rules 8(a), 12(b)(6), Fed.R.Civ.P.

The motion to dismiss Count 4, a claim for violation of the Dealer's Day in Court Act, 15 U.S.C. §§ 1221 to 1225, is denied.

The Count 5 private action for violation of RICO, 18 U.S.C. §§ 1962, 1964(c), fails to state a claim and fails to adequately particularize the allegations. Rules 8(a), 9(b), 12(b)(6), Fed.R.Civ.P. Accordingly, the motion to dismiss the RICO claim is granted as to all defendants. Plaintiff, however, has ninety days to re-allege the RICO violation by amended complaint.

Finally, defendants' motion for an award of costs and fees, Rule 11, Fed.R.Civ.P., 28 U.S.C. § 1927, is denied.

SO ORDERED.