**THEATRE PARTY ASSOCIATES, INC., Plaintiff,**

v.

**The SHUBERT ORGANIZATION, INC., Defendant.**

No. 88 CIV. 0059 (PKL).

United States District Court, S.D. New York.

Sept. 12, 1988.

Lear Sternklar & Drogin, New York City (Theodore Sternklar, of counsel), for plaintiff.

Parker Chapin Flattau & Klimpl, New York City (Alvin M. Stein, Barry J. Brett, Michael D. Friedman, Stephen G. Rinehart, of counsel), for defendant.

## ORDER

LEISURE, District Judge:

This is an antitrust action concerning an alleged market for "choice" theatre party group tickets to the "hits" of each Broadway theatre season in New York. Plaintiff alleges, in essence, that defendant, the Shubert Organization, was aware that the show "The Phantom of the Opera" was destined to become the only Broadway "hit" for the 1987–88 theatre season, that Shubert bid competitively to book that show in one of its theatres, and that Shubert then used its control of tickets to "Phantom" to pursue a scheme to dominate the relevant market.

Defendant has moved, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the complaint. For the reasons below, defendant's motion is granted.

### I.

Plaintiff Theatre Party Associates, Inc. ("Associates") is a New York corporation with its principal place of business in New York. Associates is licensed by the New York City Department of Consumer Affairs as a "theatre party agent." According to Associates, "theatre party" agents sell large blocks of advance tickets to charitable organizations or other similar groups, which in turn resell those tickets to individual theatre patrons at a substantial premium. That premium normally serves as a charitable contribution to the charitable organization. Such "theatre party" sales dif-

fer from what plaintiff labels "group sales," in that group sales are normally made after the opening date of a show has been announced, are generally not intended for resale at a premium, and are made in smaller quantities. According to plaintiff, theatre party sales have historically been the most important source of advance ticket sales, normally accounting for fifty percent of pre-opening receipts. According to plaintiff, those pre-opening receipts typically determine the financial success or failure of a show in a New York Broadway theatre. Plaintiff claims that a given theatre will normally pay theatre party agents a commission equal to ten percent of the face value of the tickets sold.

According to plaintiff, a number of months before the public announcement of the opening date of a show—that is, the time at which groups and the general public are allowed to buy tickets—theatre party agents have historically been given allocations of seats, for particular dates, by the theatre or other entity controlling the ticket distribution. However, according to plaintiff, only one or two shows during each Broadway season will be perceived by theatre party agents and their clients as appealing to theatre party patrons. Such perception is, according to plaintiff, based upon such factors as pre-opening publicity, the presence of "stars" in the show, or success of the show in another city. Shows for which these factors are present are known as "theatre party hits," and theatre party agents will normally, according to plaintiff, not accept tickets to any other shows. Moreover, plaintiff alleges that theatre party agents will only accept choice seats on choice dates of performances of those shows Choice seats are understood to be seats with unobstructed views in the forward sections of the center of the theatre. Choice dates are understood to be dates early enough in the run of a show to enable a patron to feel that he or she enjoys a significant advantage over the general ticket buying public, typically the first six weeks of a show's engagement.

Plaintiff claims that purchasers of theatre party tickets have normally and historically relied on theatre party agents' experience and expertise to help select a show and date combination that best suits the purchasers' needs. Normally, a given theatre party agent has a number of regular clients whose needs are filled from the allocation of dates given to that agent. According to plaintiff, the organizations purchasing theatre party tickets from the agents compete among themselves for sales of tickets to patrons. Thus, a given agent's clients will only be willing to continue to rely on that agent for so long as the clients perceive that the agent is capable of providing "choice" tickets to theatre party hits.

Defendant, The Shubert Organization, Inc., is a New York corporation doing business principally in New York. Of the thirty-eight theatres in New York which are considered "Broadway theatres" Shubert is alleged to own sixteen, and is alleged to be an equal partner in a seventeenth theater. Plaintiff alleges that in the three Broadway seasons preceeding the 1987–88 season, Shubert theatres booked seventy percent of all plays considered "theatre party hits."

Plaintiff's amended complaint discusses a 1950 antitrust lawsuit in which the federal government challenged the means through which the Shubert theatres acquired a dominant position in the Broadway theatre market. In 1956, that lawsuit was settled through the entry of a consent decree which placed numerous restrictions upon Shubert's activities. That consent decree forbade Shubert, *inter alia,* from "entering into any contract by which a producer is required to leave the disposition of theatre tickets ... to the sole discretion of [Shubert]" and from "owning, controlling or having any financial interest in any theatre ticket agency doing business in ... any city ... [in which Shubert] ... operates a theatre." Amended Complaint ¶ 21. According to the Amended Complaint, the consent decree was modified in 1981 to eliminate the prohibition on Shubert's operating a theatre ticket agency. At about that time, Shubert organized a "group sales" division, which sells tickets to shows appearing in Shubert theatres and in theatres operated by Shubert's competitors.

Plaintiff claims that Shubert operates its group sales division without the license required by Article 25 of the New York State Arts and Cultural Affairs Law and regulations of the New York City Department of Consumer Affairs.

Plaintiff alleges that, prior to the fall of 1987, Shubert did not compete with plaintiff or other theatre party agents in the sale to theatre party clients of choice tickets to the theatre party hits of each Broadway season. Indeed, prior to the fall of 1987, Shubert apparently allowed theatre party agents to handle all such sales.

Plaintiff claims, however, that when the 1987–88 Broadway season began, Shubert determined to engage, and did engage, upon a course of conduct intended to monopolize the Theatre Party Ticket market through interference with plaintiff's relationships with its clients. Plaintiff alleges that for the 1987–88 Broadway season, only one show qualified as a theatre party "hit"—namely, "Phantom of the Opera." Plaintiff claims that the show's "hit" status was determined because the play's author, Andrew Lloyd Webber, is internationally famous as the author of numerous hits; the play's producer, Cameron Mackintosh, is internationally famous as the producer of numerous hits; its director, Hal Prince, is internationally famous as a director and producer; Phantom was a hit in London; and Phantom received considerable publicity in New York because of, among other reasons, the opposition of the Actors Equity Association to Andrew Lloyd Webber's wife, Sarah Brightman, playing the starring role in the New York production.

Plaintiff claims that,

Shubert received the right to present Phantom only after it took the unprecedented step of offering to make almost $1,000,000 worth of structural modifications to the Magestic Theatre and offering a $500,000 investment in a less successful production. There are theatres owned by competitors of Shubert which would have been satisfactory without modification, and it was reported that Mackintosh had already decided to stage the play at the Martin Beck Theatre, owned by a Shubert competitor, when Shubert made its unmatchable offer.

Amended Complaint at ¶ 33.

Plaintiff alleges that a number of events have made the 1987–88 Broadway season "propitious" for Shubert's scheme. Amended Complaint ¶ 41. First, in January 1987, the United States District Court for the Southern District of New York relieved itself of all remaining jurisdiction over compliance with the consent decree of 1956. Second, because Phantom was anticipated to be the largest theatre party hit of all time, Shubert could be confident both that it would not require plaintiff's services, or any other agent's services, in order to sell tickets to the show, and that plaintiff's clients could easily be persuaded to abandon plaintiff and buy tickets from Shubert. Third, because no other hits were anticipated to open during the 1987–88 season, plaintiff was left without an alternate access to the market.

Plaintiff alleges that Shubert took several steps to carry out its scheme. By January 1987, when it was generally known that the London hit musical Phantom would be coming to New York to play on Broadway, considerable demand for theatre party tickets was generated among plaintiff's clients. Yet in January 1987, and for several months thereafter, Shubert refused to provide plaintiff with date allocations of choice tickets, claiming that an opening date had not been decided upon. Plaintiff thus responded to its clients' inquiries by indicating that no opening date had yet been set, and thus that no ticket allocations were available. Yet during this period, Shubert itself began to provide date allocations to theatre party clients which had contacted the theater directly.

In August 1987, without prior notification to plaintiff and contrary to the historical practice of providing agents with advance notice of opening dates, Shubert placed an advertisement in *The New York Times*, announcing the opening date of Phantom and stating, "For Theatre Parties contact your Theatre Party Agent/For Groups call (212) 239–6262." The listed

telephone number was that of the Shubert group sales division. Immediately following publication of that advertisement, plaintiff was allegedly inundated with telephone calls from irate clients. Because plaintiff still did not have allocations of tickets for the show, various of plaintiff's clients called Shubert to attempt to place their orders. Plaintiff claims Shubert intended and foresaw this course of conduct.

Plaintiff alleges that "[w]hen Shubert eventually did deign to provide plaintiff with date allocations, it substantially deviated from established practice and offered to fill proportionately far fewer requests and for far later dates than it (or other sources of tickets to previous Theatre Party Hits) had filled in the past." Amended Complaint ¶ 35(e). Plaintiff alleges that after it and other agents complained to Shubert about the foregoing events, Shubert threatened to deprive plaintiff of any date allocations for the fall of 1988 unless it first signed a general release in favor of Shubert and others, relieving Shubert and others from any liability to plaintiff and other agents for any violations of the antitrust laws, or other claims, that the foregoing acts constituted. Upon plaintiff's and other agents' refusal to sign such releases, Shubert cut off plaintiff and other agents from any ticket allocations to Phantom. Further, Shubert also refused to make any tickets to Phantom available to plaintiff's group sales division. Despite this set of circumstances, on November 22, 1987, Shubert placed another advertisement for Phantom in *The New York Times*, which stated, "For Theatre Parties, contact your theatre party agent." Amended Complaint ¶ 35(g). Allegedly, Shubert placed this advertisement with full knowledge that plaintiff and most other Theatre Party Agents would be unable to fill any date requests from clients. Allegedly, Shubert intended that plaintiff's clients would become increasingly frustrated with plaintiff's and other theatre party agents' inability to provide Theatre party tickets to Phantom, that those clients would naturally turn to Shubert for tickets, that this frustration would damage plaintiff's credibility and relationships with clients, and

that goodwill toward Shubert would permit Shubert to consolidate its monopoly hold in the market in the future.

According to plaintiff, demand for Phantom was so great that advance sales totaled approximately $15 million, the largest advance sale in the history of Broadway theatre. Moreover, plaintiff alleges that while "choice" dates for theatre party sales normally exist only for the first six weeks of a show's run, theatre party demand for tickets to Phantom continued long beyond the choice date period.

## II.

On a motion to dismiss, the complaint must be read generously and every reasonable inference drawn in favor of the plaintiff. *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986); *Metzner v. D.H. Blair & Co., Inc.*, 663 F.Supp. 716, 719 (S.D.N.Y.1987). The complaint thus should only be dismissed if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Stone v. Chung Pei Chemical Industry Co. Ltd.*, 790 F.2d 20, 22 (2d Cir.1986). Indeed, it is the Court's duty "to determine whether the facts set forth justify taking jurisdiction on grounds other than those most artistically pleaded." *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 558 (2d Cir.1985) (citations omitted).

### The Monopolization Claim

■ The essential elements of a monopolization claim under Section 2 of the Sherman Act are: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). To state a claim properly under Section 2 a complaint must allege a definition of the relevant product market. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 840 (2d Cir.1980). This rele-

154

vant product market must include all products that are reasonably interchangeable, *see United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Nifty Foods*, 614 F.2d at 840, and this alleged product market must be plausible. *See Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982).

Plaintiff's proposed market—advance sales of selected tickets to the early run of Phantom—does not comprise a viable antitrust market. The federal courts, in the context of Rule 12 motions to dismiss, have not hesitated to reject market allegations that make no economic sense under any set of facts. For example, in *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 679 (S.D.N.Y.1987), the Court granted defendant's motion to dismiss on the grounds that the alleged relevant market, Rolex watches, was theoretically untenable: "[t]his Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces. Since plaintiff has not alleged a plausible product market, his § 2 claims are dismissed." In *Gianna Enterprises, supra*, the Court dismissed plaintiff's Section 1 claim alleging a conspiracy to restrain trade in the market for "international beauty pageants," explaining:

[p]laintiff has failed, however, to attempt to explain why this market excludes other state and national beauty pageants, of which there are dozens if not hundreds. Moreover, it has made no attempt to explain why beauty pageants alone can be treated as a separate market for competition to obtain modelling or other positions in the advertising or entertainment world ... Plaintiff simply delineates the product market based on the perceived similarity of services offered. This bears no rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products.

*Id.*, 551 F.Supp. at 1354.

Though defining the relevant product market here as advanced sales of selected tickets to "theater party hits", plaintiff alleges that Phantom of the Opera is the only show in the 1987–88 season that falls within the relevant market. Plaintiff appears to have narrowly defined the market in an attempt to conform the alleged market to the facts of the present case. In *Belfiore v. New York Times Co.*, 826 F.2d 177 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988), the Court rejected the plaintiff's definition of the relevant market as "implausible" and "an awkward attempt to conform their theory to the facts they allege." *Id.* at 180. The plaintiffs in that case had alleged that the New York Times Co. monopolized the "general interest daily newspapers directed primarily to upscale readers" market, a market which included only the *New York Times. Id.* The Court found this market definition theoretically implausible and rejected it. The Court defined the relevant market as general circulation daily newspapers, a market in which not only the Times—but also the *New York Post* and *New York Daily News*—competed.

In the present case, Associates has failed to set out a theoretically rational explanation to support its proposed relevant product market. The complaint alleges that it is the "theatre party agents" who determine what is to constitute a "theatre party hit"; "[t]heatre Party Clients normally and historically have relied on theatre party agents' experience and expertise to help select a show and a day/date combination that best suits the needs of the Client." Amended Complaint at ¶ 8. Therefore, in the market plaintiff has alleged, it and to some extent its clients determine, based on their own perceptions, what shows they believe will appeal to theatre party patrons and therefore be deemed "theatre party hits" for that season. Delineating the market each year based solely on plaintiff's perception of similarities of shows is not sufficient. *See Gianna Enterprises*, 551 F.Supp. at 1354. Plaintiff has failed to explain why other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events are not ade-

quate substitute products. The fact that plaintiff chose to operate in a single market—the most popular Broadway shows—does not make it a relevant market for antitrust purposes. *See MLC, Inc. v. North American Philips Corp.*, 1983–1 CCH Trade Cases ¶ 65,351, at 70,093 (S.D. N.Y.1983) [available on WESTLAW, 1983 WL 1811]. Clearly, the market proposed by plaintiff does not include alternative sources of, and substitutes for, defendant's product which reflect commercial realities.

Monopoly power is the power to control price or exclude competition in the relevant market. In *United States v. E.I. Dupont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956), the Supreme Court stated:

> [O]ne can theorize that we have monopolistic competition in every non standardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly.

It is well settled that a manufacturer's monopoly over the distribution of its own product cannot form the basis of a valid monopolization claim. *See, e.g. Shaw v. Rolex Watches, U.S.A. Inc.*, 673 F.Supp. 674 (S.D.N.Y.1987); *Gregoris Motors v. Nissan Motor Corp. in U.S.A.*, 630 F.Supp. 902 (E.D.N.Y.1986) (Datsun automobiles); *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649 (S.D.N.Y.1980), *aff'd per curiam*, 697 F.2d 495 (2d Cir. 1983) (each of three major television networks' own programming is not a separate market).

Artful pleading can not disguise that plaintiff is merely alleging that defendants had a monopoly in the distribution of tickets to Phantom of the Opera. Plaintiff seeks to include the 1985–87 seasons as relevant to its monopolization claim, yet plaintiff also alleges that defendant only entered the proposed market in the 1987–88 season. Defendant cannot have monopoly power in a market in which they were not present.

■ Furthermore Associates claim to freedom from competition for its clients is barred by controlling precedents which establish that Shubert had the right to refuse to deal with plaintiff completely, or alternatively, to compete with plaintiff. Because a manufacturer or seller is free to control the distribution of its own product, it can unilaterally terminate or replace independent distributors and vertically integrate without violating the antitrust laws. Vertical integration without more, even by a monopolist, does not offend Section 2. *Belfiore v. New York Times Co.*, 826 F.2d 177 (2d Cir.1987).

Here defendant concededly had a monopoly over the distribution of the tickets to Phantom of the Opera which ran at its theatre. Defendant decided to change its distribution system and enter the market itself as a theatre party agent. In so doing it delayed date allocations and offered fewer tickets to plaintiff. Even if defendant changed its distribution system, this would constitute no violation of the antitrust laws. Such vertical integration increases competition. Plaintiff's complaint is that there is now more competition among "theatre party agents".

■ Plaintiff's claim also fails to meet the second element of a valid Section 2 claim of monopolization—that there was a wilful acquisition or maintenance of monopoly power by Shubert through unlawful conduct. Plaintiff has alleged no illegal act by Shubert. Shubert could have decided to be the sole distributor of Phantom tickets without running afoul of the antitrust laws. Plaintiff's only possible objection is that defendant's acts took business away from plaintiff. This is not cognizable under the antitrust laws, which were designed to protect competition and not competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 2d 510 (1962); *Kelco Disposal, Inc v. Browning–Ferris Industries*, 845 F.2d 404 (2d Cir.1988).

This case is a clear example of growth and development in market power as a

consequence of superior product, business acumen and historic accident which must be distinguished from the willful acquisition of monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Plaintiff admits that Phantom was anticipated to be the largest Broadway hit of all times. Amended Complaint ¶ 41. Shubert saw this business opportunity and bid competitively for it. Thereafter Shubert decided to change its distribution system. Whatever the reason for this change defendant's acts were all lawful and can lead to growth in its share of the theatre party tickets market as a result of business acumen.

Plaintiff has failed as a threshold matter to allege a relevant product market. As a result it is impossible for plaintiff to allege that Shubert had monopoly power. Defendant's motion to dismiss plaintiff's monopolization claim pursuant to Rule 12(b)(6) is granted.

### Attempt to Monopolize

The elements of the offense of attempt to monopolize are: (1) anticompetitive or exclusionary conduct, (2) specific intent to monopolize and (3) a "dangerous probability" that the attempt will succeed. *American Tobacco Co v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786 (2d Cir.1987), *cert. denied,* —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). The "dangerous probability" element of an attempt to monopolize claim requires proof of "significant market power" in a relevant product market. *Id.* at 790–91; *Levitch v. Columbia Broadcasting System*, 495 F.Supp. 649, 668 (S.D.N.Y. 1980), *aff'd,* 697 F.2d 495 (2d Cir.1983). Since plaintiff has failed to define a relevant market it is unable to show that Shubert possesses a significant market share. Additionally, as Phantom is a unique show, Amended Complaint ¶ 29, proving to be the largest Broadway hit of all time, Amended Complaint ¶ 41(b), there is no dangerous probability that any alleged power Shubert may have will extend to other seasons.

Plaintiff has failed to state a necessary element of the claim of attempted monopolization. Defendant's motion to dismiss pursuant to Rule 12(b)(6) is granted.

### CONCLUSION

Thus, plaintiff's amended complaint fails to state a civil antitrust claim pursuant to 15 U.S.C. § 2, and thus plaintiff's third claim for relief must be dismissed.

Plaintiff's remaining claims are pendent state law claims. Because these pendent claims provide no other basis for federal jurisdiction, and because no considerations of judicial economy would be served at this stage of the litigation by retaining jurisdiction over the pendent claims, those claims are likewise dismissed. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Mastercraft Industries Inc. v. Breining*, 664 F.Supp. 859, 861 (S.D.N.Y. 1987); *In Re Investors Funding Corp. of N.Y. Securities Litigation*, 523 F.Supp. 550, 560 (S.D.N.Y.1980).

SO ORDERED.